# UNITED STATES ARMY COURT OF CRIMINAL APPEALS

Before
PENLAND, MORRIS and ARGUELLES[1]
Appellate Military Judges

**UNITED STATES, Appellee**
v.
**Sergeant MICHAEL V. SMITH**
**United States Army, Appellant**

ARMY 20230029

Headquarters, U.S. Army Intelligence Center of Excellence and Fort Huachuca
Michael E. Korte, Military Judge
Lieutenant Colonel Stephen E. Latino, Acting Staff Judge Advocate

For Appellant: Colonel Phillip M. Staten, JA; Major Mitchell D. Herniak, JA; Captain Matthew S. Fields, JA (on brief); Colonel Philip M. Staten, JA; Lieutenant Colonel Autumn R. Porter, JA; Major Matthew S. Fields, JA (on brief and reply brief on specified issue).

For Appellee: Colonel Christopher B. Burgess, JA; Lieutenant Colonel Kalin P. Schlueter, JA; Captain Patrick S. Barr, JA; Captain Alex J. Berkun, JA (on brief); Captain Patrick S. Barr, JA; Captain Alex J. Berkun, JA (on brief on specified issue).

21 October 2024

------------------------------------
MEMORANDUM OPINION
------------------------------------

*This opinion is issued as an unpublished opinion and, as such, does not serve as precedent.*

ARGUELLES, Judge:

A military judge sitting as a general court-martial convicted appellant, contrary to his pleas, of one specification of sexual assault, one specification of abusive sexual contact, one specification of assault consummated by battery, and one specification of extramarital sexual conduct (adultery) in violation of Articles 120, 128, and 134, Uniform Code of Military Justice, 10 U.S.C. §§ 920, 928, 934 [UCMJ]. The military judge sentenced appellant to confinement for forty months and fifteen days, reduction to the grade of E-1, and a dishonorable discharge. The convening authority took no action on the findings and sentence.

---

[1] Judge ARGUELLES decided this case while on active duty.

This case is now before us for review under Article 66, UCMJ. In addition to the single assignment of error, we ordered the parties to address two issues, one of which appellant personally raised pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982). Having fully considered all the pleadings and the entire record, we find that appellant's adultery conviction is legally insufficient and must be set aside, but otherwise affirm the verdicts of guilty and the sentence imposed.[2] We provide appropriate relief in our decretal paragraph.

## BACKGROUND

On the evening of 9 April 2021, appellant joined a group of soldiers drinking near a smoke pit by their barracks on Fort Huachuca. Appellant and the other soldiers, to include the three named victims in this case, were all assigned to Fort Huachuca as students attending military intelligence courses, although they were not all in the same class. Appellant was not a friend of the group but joined them at some point in the evening with a bottle of whiskey.

Multiple witnesses testified that although he did not appear to be drinking much himself, and/or would put his thumb over the top of the bottle when he raised it to his mouth, appellant was encouraging the others to drink from his whiskey bottle. The same witnesses also testified that the victim of the sexual assault specification ("victim") appeared to be the "focus" of appellant's attention.

In addition to the sexual assault, the charge sheet alleged two specifications of abusive sexual contact. The first alleged abusive sexual contact occurred outside during the gathering at the smoke pit, when, as the second victim testified, appellant grabbed his buttocks in a sexual manner. For this specification, the military judge returned a verdict of not guilty of abusive sexual contact but guilty of the lesser included offense of assault consummated by battery. The third victim was not at the party, but rather woke up in his bed around 2330 that night to appellant stroking his lower back and asking to perform fellatio on him. For this specification, the military judge returned a verdict of guilty for abusive sexual conduct as charged.

## LAW AND DISCUSSION

### A. Legal Sufficiency of Sexual Assault Specification

Specification 1 of Charge I alleged sexual assault in that appellant committed a sexual act upon the victim "by causing contact between [appellant's] mouth and [victim's] penis, when [victim] was incapable of consenting to the sexual act

---

[2] We have also given full and fair consideration to the other matters personally raised by appellant pursuant to *Grostefon* and find them to be without merit.

because he was impaired by an intoxicant, to wit: alcohol, and the accused knew and reasonably should have known of that condition."

The military judge struck "knew" from the specification in his guilty finding, determining that the government proved beyond a reasonable doubt only that appellant "reasonably should have known" that the victim was too intoxicated to consent. Appellant now argues that because the government failed to prove that a reasonable person would believe the victim was too drunk to consent to the sexual act, the specification is legally insufficient. For the reasons set forth below, we disagree.

*1. Additional Facts*

As described above, multiple witnesses testified that the victim appeared to be the "focus" of appellant's efforts to drink from his bottle of whiskey. These same witnesses also described the victim at the end of the night as "pretty drunk" and "intoxicated." The victim testified that over the course of the evening he drank "a lot" of different kinds of alcohol, and that appellant was "very pushy" in having him drink directly out of his whiskey bottle. The victim said he was feeling "very intoxicated," and that as the gathering outside ended, he was "even more intoxicated" and "dizzy and nauseous."

The victim testified that he recalled getting into an argument in the hallway after the gathering ended, although he did not remember who he was arguing with or what it was about, and that when the argument finished, he went back to his room to find appellant waiting for him. The victim said he did not invite appellant into his room, and that when asked what he was doing there, appellant said "just here to chill." The victim testified that his last memory before passing out was taking one more drink from the bottle, and that his next memory was regaining consciousness for a "split second" while appellant was performing fellatio on him, after which he immediately blacked out again. The victim further explained that in that "split second" he felt like he was "really out of it," he could not move, and "my brain couldn't register what was going on." The victim stated that at no point did he ask or tell appellant to perform any sexual acts on him, and that when he briefly regained consciousness in the middle of the act, he did not feel like he could talk or tell appellant to stop. The victim did, however, remember appellant saying something along the lines of "you won't report this."

The victim testified that when he woke up again he was alone, there was vomit on the floor, and he felt very confused "like my head was clouded and I knew something was wrong." The victim described how he was sobbing uncontrollably and very emotional and immediately called his wife who told him to go find someone for help. After getting off the phone with his wife, the victim went and found some of his friends who called the installation Sexual Assault Response

Coordinator (SARC). The SARC promptly responded, took a report, and transported the victim to an off-post medical clinic for a sexual assault examination. There was also evidence presented that after this incident the victim did not like to be alone and that other soldiers "went with him to certain places to make sure he was safe," including the bathroom.

Appellant also testified at trial, first describing a prior incident in Bisbee, Arizona in March of 2021 when he performed oral sex on the victim in a car after the victim was kicked out of a hookah lounge for being drunk and belligerent. Although in his testimony the victim admitted to briefly being in the car with appellant in Bisbee, he denied that appellant performed any sexual acts on him.

With respect to the night in question, appellant testified that as the gathering was ending, the victim was talking, making sense, and walking on his own, and that he and the victim, along with a "gaggle" of soldiers, all went up to the victim's room. After the victim got into an argument in the hallway with a senior enlisted soldier and the room emptied, appellant returned to the victim's room by himself. When the victim asked what he was doing there, appellant suggested they watch a movie, and the two started talking. Per appellant, after the victim started complaining about toxic leadership and wanting to fight the individual he argued with earlier in the hall, appellant asked the victim if he could perform fellatio on him, to which he said "oh, yeah I – I remember last time [ ] it felt good." Appellant also testified that after he started performing oral sex, the victim did not push his head away or tell him to stop, and that the victim was awake and functioning during the entire encounter. On cross-examination, appellant admitted that he did tell an Army Criminal Investigation Division Agent that the victim "couldn't handle his alcohol."

The defense also called a forensic psychologist who testified that while it was possible that the victim was suffering from a "fragmentary" blackout in which he appeared to appellant as alert and conscious, it was also possible that he "fell asleep intermittently" during his encounter with appellant.

*2. Law and Analysis*

Our review for legal sufficiency is de novo. *United States v. Robinson*, 77 M.J. 294, 297 (C.A.A.F. 2018). "The test for legal sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 297-98 (quoting *United States v. Rosario*, 76 M.J. 114, 117 (C.A.A.F. 2017)). Because we must draw "every reasonable inference from the evidence of record in favor of the prosecution," the standard for legal sufficiency "involves a very low threshold to sustain a conviction." *United States v. Smith*, 83 M.J. 350,

359 (C.A.A.F. 2023) (quoting *United States v. King*, 78 M.J. 218, 221 (C.A.A.F. 2019)).

As applied in this case, the elements of sexual assault as charged in Specification 1 of Charge I are: (1) appellant committed a sexual act upon the victim; (2) he did so when the victim was incapable of consenting because he was impaired by alcohol; and (3) appellant reasonably should have known of that condition. *Manual for Courts-Martial, United States* (2019 ed.) [*MCM*], pt. IV, ¶ 60.b.(2)(f). The term "incapable of consenting" is defined as "incapable of appraising the nature of the conduct at issue; or physically incapable of declining participation in, or communicating unwillingness to engage in, the sexual act at issue." *Id.* at ¶ 60.a.(g)(8). *See also United States v. Bailey*, 77 M.J. 11, 15 (C.A.A.F. 2017) ("Requiring that the complainant be completely unable to communicate is a higher burden than the statute requires and thus is an erroneous statement of the law.").

In *Smith*, witnesses described the sexual assault victim as falling over, slurring her speech, too drunk to unlock her phone and find the address of the hotel, and urinating on the hotel beds. 83 M.J. at 360. In *Robinson*, witnesses described the victim as stumbling, slurring her speech, and almost hitting a stop sign when driving from the party. 77 M.J. at 298. In both cases, the Court of Appeals for the Armed Forces (C.A.A.F.) found that the evidence was legally sufficient to find that the victim was too intoxicated to consent.

The thrust of appellant's argument is that because the victim in this case was nowhere near as intoxicated as the victims in *Smith* and *Robinson*, his conviction is legally insufficient. But, the C.A.A.F. in *Smith* and *Robinson* did not set any type of baseline or requisite level of intoxication when conducting a legal sufficiency analysis. Rather the C.A.A.F. simply held that, on the facts presented, the victim in each of those cases was too intoxicated to consent. As such, any attempt to argue legal insufficiency in this case based solely on a comparison of the facts in *Smith* and *Robinson* is without merit. To the contrary, as noted above, to determine if the sexual assault conviction in this case is legally sufficient, we must determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

To the extent appellant is also asserting that this case is legally insufficient because the only evidence of the victim's inability to consent at the time the sexual act is the conflicting testimony of the victim and appellant, both this court and the C.A.A.F. have previously rejected this argument. *See, e.g. Smith*, 83 M.J. at 360 ("A reasonable panel could have given greater weight to evidence concerning the extent of her intoxication than to Appellant's self-serving statements to AFOSI about her active, willing participation in the conduct at issue."); *United States v. Chinchilla*,

ARMY 20150266, 2017 CCA LEXIS 561, at *12 (Army Ct. Crim. App. 18 Aug. 2017) (mem. op.) ("We find appellant's self-serving version of the encounter not credible."); *cf. United States v. Ross,* ARMY 20190537, 2020 CCA LEXIS 353 at *12 (Army Ct. Crim. App. 30 Sep. 2020) (mem. op.) ("Contrary to what appellant now suggests, however, the mere fact that he testified to a different or exculpatory version of the incident does not necessarily mean that there is a 'fair and rational hypothesis other than guilt.' If this were the law, not many sexual assault convictions would survive appellate review.").

Finally, appellant argues that the victim's actions both before and after the sexual assault, to include bringing down a pitcher of water at the end of the night, walking up the stairs under his own power, getting into an argument with another solider in the barracks, and having a memory of being sexually assaulted, all demonstrate that he was not too drunk to consent. This court considered and appropriately rejected similar arguments in *United States v. Mannan*:

> There seems to be little dispute that [victim] was highly intoxicated most of the evening in question. [Victim's] own testimony and the testimony of other witnesses establish [victim] was intoxicated. We have no doubt that she nevertheless had the cognitive ability to appreciate her surroundings and actions much of the time. This does not answer the core question, however, of whether [victim] had the cognitive ability to appreciate the nature of appellant's sexual acts and the ability to communicate consent – or lack thereof – at the critical moments when appellant performed sexual acts upon her. Former capacity does not guarantee capacity in the future, and later capacity is not necessarily indicative of capacity in the past. In other words, capacity to consent is not so much an event horizon – from whose bourn no traveler returns – as a threshold, which may be crossed in both directions.

ARMY 20170096, 2019 CCA LEXIS 169, at *7-8 (Army Ct. Crim. App. 11 Apr. 2019) (mem. op.).

In sum, viewing the entire record in the light most favorable to the prosecution, to include the testimony of the victim, appellant, and the other witnesses who were present during the evening, we find that the government has presented sufficient evidence to establish that appellant reasonably should have known that the victim was too intoxicated to consent to the sexual act. Accordingly, appellant's conviction for sexual assault is legally sufficient.

### B. Adultery Specification

#### 1. Additional Facts

The Specification of Charge II alleged that appellant wrongfully engaged "in sexual conduct with [victim], a person the accused knew was not the accused's spouse, and that such conduct was to the prejudice of good order and discipline in the armed forces, and of a nature to bring discredit upon the armed services." In order to prove this offense, the government was required to show: (1) appellant wrongfully engaged in extramarital conduct with a person who was not his spouse; (2) at the time appellant knew he or the other person was married to someone else; and (3) that such conduct was either to the prejudice of good order and discipline in the armed forces or was of a nature to bring discredit upon the armed forces. *MCM*, pt. IV, ¶ 99.b.

In its case in chief, the government did not offer *any* evidence that appellant was married. Although asked on cross-examination if appellant told him in Bisbee that he was married to another man, the victim's response was "I don't remember." Likewise, although the government offered appellant's Enlisted Record Brief into evidence, trial counsel redacted the entire document except for appellant's height and weight. The government also did not present any evidence at trial that the other two victims, or any other witnesses or soldiers, were aware that appellant was married to another man, or that appellant's adultery had any impact on the command.

Rather, the *first* time at trial the fact finder heard that appellant was married was appellant's testimony in the defense case:

A: And I said that, "I'm married." And he asked, "why?" And I said, "it's because I'm married to a man."

. . .

DC: All right. While these incidents occurred in Bisbee and on the 9th of April, you were married at the time?

A: I was, sir.

DC: Who were you married to?

A: Keagan [phonetic].

DC: And who is Keagan?

A: My ex-husband.

7

DC: Your ex-husband. Okay. And even though you were married at the time, you still engaged in this sexual encounter with someone else, correct?

A: I did, sir.

DC: Why?

A: It was kind of like an open relationship, sir.

DC: Okay. Had your ex-husband had other relationships while married?

A: Correct.

Not only did the government not put on any evidence of appellant's marital status in its case-in-chief, it also did not even mention, much less argue, the adultery specification in its initial closing argument. In his closing, defense counsel highlighted the government's failure to prove up either of the two terminal elements, and with respect to the prejudice to good order and discipline element, further stated "I want to refer the court to *U.S. v. Richard*." In his final rebuttal argument, trial counsel not only failed to respond to defense counsel's argument, but once again neglected to even mention the adultery specification.

With respect to the terminal element of The Specification of Charge II, the military judge found appellant's conduct only to be to the prejudice of good order and discipline in the armed forces, and excepted out the words "of a nature to bring discredit upon the armed services."

For the reasons explained below, we find that the adultery specification is legally insufficient and must be set aside.

### 2. Legal Sufficiency of Adultery Specification

In *United States v. Richard*, the case defense counsel cited to the military judge, the C.A.A.F. reiterated that the Supreme Court held that the "very broad reach of the literal language of Article 134" was narrowed "to conduct that is 'directly and palpably – as distinguished from indirectly and remotely – prejudicial to good order and discipline.'" 82 M.J. 473, 477 (C.A.A.F. 2022) (citing *Parker v. Levy*, 417 U.S. 733, 753-54 (1974)); *see also United States v. Caldwell*, 72 M.J. 137, 140 (C.A.A.F. 2013) ("The acts in question must be 'directly prejudicial to good order and discipline,' and not 'prejudicial only in a remote or indirect sense.'" (citing *MCM*, pt. IV, ¶ 60.c(2)(a))).

8

The C.A.A.F. in *Richard* also noted that in upholding the validity of the Article 134 terminal element, the Supreme Court took comfort in the fact that the President expressly codified that limitation in the *Manual for Courts-Martial* and specifically pointed to the adultery specification as an example of the "more detailed explanations that the President has provided in the *Manual* to distinguish conduct that does prejudice good order and discipline from conduct that does not." 82 M.J. at 478; *see also United States v. Wells*, __ M.J. __, 2024 CAAF LEXIS 552, at *10-11 (C.A.A.F. 24 Sep. 2024) ("This Court has stated that '[p]residential narrowing of the 'general' article through examples of how it may be violated is part of why Article 134, UCMJ, 'is not considered unconstitutionally void for vagueness. Further, it is this narrowing of the breadth of Article 134 through these presidential enumerations that provides servicemembers with fair notice of what conduct is subject to criminal sanction under the statute." (internal citations omitted)); *United States v. Wilcox*, 66 M.J. 442, 447 (C.A.A.F. 2008) ("But the Supreme Court upheld Article 134, UCMJ, against constitutional attack for vagueness and overbreadth *in light of* the narrowing construction developed in military law through the precedents of this Court and limitations within the *Manual for Courts-Martial* (*MCM*) itself." (citing *Parker*, 417 U.S. at 752-61) (emphasis in original)).

In pertinent part, the *Manual for Courts-Martial* states that "[e]xtramarital conduct that is directly prejudicial to good order and discipline includes conduct that has an obvious, and measurably divisive effect on unit or organization discipline, morale, or cohesion, or is clearly detrimental to the authority or stature of or respect toward a Servicemember, or both." *MCM*, pt. IV, ¶ 99.c.(1). The same provision also states although extramarital conduct that is private and discreet may still be prejudicial to good order and discipline, the following factors are relevant to any such determination:

(a) The accused's marital status, military rank, grade, or position; (b) The co-actor's marital status, military rank, grade, and position, or relationship to the armed forces; (c) The military status of the accused's spouse or the spouse of the co-actor, or their relationship to the armed forces; (d) The impact, if any, of the extramarital conduct on the ability of the accused, the co-actor, or the spouse of either to perform their duties in support of the armed forces; (e) The misuse, if any, of Government time and resources to facilitate the commission of the conduct; (f) Whether the conduct persisted despite counseling or orders to desist; the flagrancy of the conduct, such as whether any notoriety ensued; and whether the extramarital conduct was accompanied by other violations of the UCMJ; (g) The negative impact of the conduct on the units or organizations of the accused, the co-actor or the spouse of either of them, such as a detrimental effect on unit or organization morale, teamwork, and

efficiency; (h) Whether the accused's or co-actor's marriage was pending legal dissolution, which is defined as an action with a view towards divorce proceedings, such as the filing of a petition for divorce; and (i) Whether the extramarital conduct involves an ongoing or recent relationship or is remote in time.

*Id.*

The absence of any evidence pertaining to virtually all the relevant factors in this case is striking. Indeed, the only factor present is the fact that other violations of the UCMJ accompanied the extramarital conduct. Moreover, although there was evidence offered at sentencing by the victims as to how the *sexual assaults* impacted them in the performance of their duties, this evidence was not before the fact finder on the merits, and in any event, no victim testified that appellant's *adultery* had any impact on their performance.

The government makes no mention of *Richard* or the other relevant case law, but instead cites only to the fact that other violations of the UCMJ accompanied the adultery to argue that the conviction is legally sufficient. The government does not address, however, the absence of every other relevant factor, nor does it explain how appellant's adultery was "directly and palpably" prejudicial to good order and discipline. Although it addressed this terminal element in the context of possession and production of child pornography, we find the CAAF's holding in *Richard* to be equally applicable here:

> Based on the record here, we conclude that Appellant's Article 134 convictions were not legally sufficient. As an initial matter, the Government failed to proffer any evidence that Appellant's misconduct had any negative effect—indeed, any effect at all—on the good order and discipline of the armed forces. No one in the military had any idea that Appellant was producing child pornography in his barracks dorm room, and there is no evidence that this misconduct interfered in any way with any of the traditional hallmarks of good order and discipline identified by Winthrop in his treatise or the President in the *Manual*.

82 M.J. at 478-79.

While we agree with the government that appellant's *sexual assaults* directly impacted those involved and were more likely to be prejudicial to good order and discipline, we cannot say the same for his adulterous conduct. Accordingly, in the context of an analysis of the legal sufficiency of the terminal element, we reject the government's attempt to bootstrap the adultery conviction, which had *no* impact on any of the soldiers this case, direct or otherwise, onto appellant's sexual assault convictions.

In sum, even after drawing every reasonable inference from the evidence in favor of the government, after our review of the entire record and for all the reasons set forth above, we find the adultery conviction to be legally insufficient. *See United States v. Jonsson*, 67 M.J. 624, 628 (C.G. Ct. Crim. App. 2009) ("While an adulterous relationship between two personnel assigned to different units could have impacts sufficiently prejudicial to good order and discipline to fulfill the third element of the adultery offense, the record must identify those impacts. In this case, the record is devoid of such information."); *United States v. Powell*, ARMY 20150562, 2018 CCA LEXIS 19, at *6 (Army Ct. Crim. App. 16 Jan 2018) (summ. disp.) ("However, no evidence was elicited relating to anyone's knowledge of sexual intercourse on 27 July 2014 as charged, or that such conduct was prejudicial to good order and discipline. Without such evidence, this [adultery] specification is legally and factually insufficient."); *United States v. Davis*, ARMY 20100375, 2012 CCA LEXIS 184, at *2-4 (Army Ct. Crim. App. 23 May 2012) (summ. disp.) (holding that adultery specification based on one-time alleged sexual assault occurring in barracks room when no one else was present is factually and legally insufficient).

## C. *Article 55/Eighth Amendment Claim*

### 1. *Additional Facts*

Appellant seeks sentence relief on grounds that he has suffered cruel and unusual punishment, in violation of Article 55, UCMJ and the Eighth Amendment of the United States Constitution. Specifically, this claim is based on: (1) the conditions in the Cochise County jail where appellant was housed for thirty days while awaiting transport to Joint Regional Correctional Facility (JRCF) at Fort Leavenworth, Kansas; (2) the failure of medical staff at the JRCF to treat his hernia; (3) the failure of medical staff at the JRCF to dispense his medication in the proper amount; and (4) the failure of the JRCF to pay him sufficiently for his work at the institution. Appellant submitted two supplemental pleadings attaching documentation in support of his claims. For the reasons set forth below, appellant's claims are without merit.[3]

### 2. *Law*

To establish a violation of Article 55 or the Eighth Amendment, an appellant must show "(1) an objectively, sufficiently serious act or omission resulting in the denial of necessities; (2) a culpable state of mind on the part of prison officials amounting to deliberate indifference to his health and safety; and (3) that he has exhausted the prisoner-grievance system and has petitioned for relief under Article

---

[3] Given that the facts alleged in appellant's supplemental pleadings would not result in relief even if we accept them all as true, we may resolve these claims without a post-trial hearing. *United States v. Ginn*, 47 M.J. 236, 248 (C.A.A.F. 1997).

138, UCMJ." *United States v. Pullings*, 83 M.J. 205, 209 (C.A.A.F. 2023) (citing *United States v. Lovett*, 63 M.J. 211, 215 (C.A.A.F. 2006)); *United States v. Wise*, 64 M.J. 468, 469 (C.A.A.F. 2007). The C.A.A.F. in *Pullings* also reaffirmed that with respect to claims of cruel and unusual punishment, appellate courts may properly consider supplemental matters outside the record of trial. 83 M.J. at 211.

With respect to exhaustion, the C.A.A.F. has held that this requirement promotes resolution of grievances at the lowest possible level and ensures the development of an adequate appellate record. *United States v. Miller*, 46 M.J. 248, 250 (C.A.A.F. 1997). "An appellant who asks us to review prison conditions, a matter not normally within our appellate jurisdiction, must establish a clear record demonstrating the legal deficiency in administration of the prison and the jurisdictional basis of our action." *Id.* Finally, this exhaustion requirement mandates that absent unusual or egregious circumstances, appellant demonstrate both that "he has exhausted the prisoner-grievance system in his detention facility and that he has petitioned for relief under Article 138." *Wise*, 64 M.J. at 471 (citing *United States v. White*, 54 M.J. 469, 472 (C.A.A.F. 2001)).

With respect to nonmedical needs, the question of whether prison officials "were *deliberately indifferent* depends on two factual questions: (1) what the officials knew; and (2) whether they disregarded known risks to inmate safety." *Pullings,* 83 M.J. at 211-12 (emphasis in original) (internal citations and quotations omitted). With respect to medical needs, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to *serious* medical needs. *Id.* at 212 (citing *Estelle v Gamble*, 429 U.S. 97, 106 (1976)).

Finally, although it appears that the C.A.A.F. has not directly addressed the issue of prisoner wages in the context of Article 55 or the Eighth Amendment, federal courts have unanimously held that there is no inherent constitutional right to wages for work performed while incarcerated. *See e.g. Sigler v. Lowrie*, 404 F.2d 659, 661 (8th Cir. 1968) (holding that compensation for prison labor is "by grace of the state"); *Vansike v. Peters*, 947 F.2d 806, 809 (7th Cir. 1992); *Newsom v. Norris*, 888 F.2d 371, 374 (6th Cir. 1989); *Draper v. Rhay*, 315 F.2d 193, 197 (9th Cir. 1963); *cf. United States v. Avila*, 53 M.J. 99, 102 (C.A.A.F. 2000) ("The fact that regulations were not followed does not demonstrate 'a sufficiently serious' deprivation under the Eighth Amendment.").

### 3. Analysis

With respect to his confinement at the Cochise County Jail, appellant alleges that while housed in that facility for thirty days: (1) the toilet leaked with fecal matter accumulating on the floor; (2) there was uncleaned vomit in his room; (3) he was never given any clean socks or underwear; (4) he was housed with inmates suffering violent drug withdrawals; and (5) he was only allowed outside of his cell

for one hour a day to shower. Other than the lack of clean socks or underwear, appellant does not allege that he informed the facility of any of his complaints.

In short, other than his conclusory allegation that thirty days was not enough time, appellant fails to sufficiently explain why he could not utilize the internal grievance process at the Cochise County Jail. Likewise, appellant fails to explain why he apparently was able to lodge his complaints about a lack of socks and underwear, but not any of his other grievances. As such, because appellant has failed to establish any unusual or egregious circumstances excusing his failure to exhaust his remedies, this claim is without merit.[4] *See United States v. Heard*, ARMY 20200221, 2021 CCA LEXIS 357, at *6-7 (Army Ct. Crim. App. 21 Jul. 2021) (mem. op.) (denying appellant's Article 55/Eighth Amendment claim where appellant failed to utilize Comanche County Jail prisoner-grievance system); *Pullings*, 83 M.J. at 213 ("[N]o violation of Article 55, UCMJ, and the Eighth Amendment can occur unless the prisoner in fact suffers ill treatment within the facility and files a grievance and Article 138, UCMJ, petition about it.").

Appellant next asserts that the medical staff at the JRCF failed to treat his hernia, but also admits that as part of his treatment plan he participated in physical-therapy for hernia pain management in April of 2024. The fact that appellant might disagree with the course of treatment for his ailment, or otherwise question the effectiveness of his physical therapy, however, does not demonstrate that prison officials are acting with "deliberate indifference" to his health and safety. As such, this claim is also without merit. *See Estelle*, 429 U.S. at 106 ("[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment.").

Appellant next alleges that after his physical therapist encouraged him to ask for a change in medications, upon receipt of such medicine, medical staff first told him to take one pill, three times a day, but later that same evening directed him take all three pills at once. Unfortunately, after appellant swallowed the three pills, staff realized their error in reading the prescription but told him he was "fine." Although appellant now claims this "overdose" was an Article 55/Eighth Amendment violation, he also admits that the on-duty medic went to his housing facility three hours later to wake him up and check his vital signs. Likewise, appellant concedes that he was again called into the medical clinic the next morning for follow-up where he reported that he "just felt a little tired but overall was OK." While it is

---

[4] With respect to the socks and underwear grievance which appellant alleges he did lodge with the facility, we find it hard to believe that the facility does not provide inmates with some sort of means to launder their personal items, and in any event, this claim standing alone does not rise to the level of an Article 55 or Eighth Amendment violation.

unfortunate that medical staff gave appellant the wrong advice as to the proper dosage of his medication, the facts that a medic followed up with him three hours later in the middle of the night to check his vital signs and that he was called back to the medical clinic the next morning show that the facility was not acting with "deliberate indifference" to his health and safety. *See Estelle*, 429 U.S. at 106.

Finally, as noted above, appellant's claim that the JRCF is not paying him enough for his work at the institution is not cognizable under either Article 55 or the Eighth Amendment. *See Vansike*, 947 F.2d at 809; *Sigler*, 404 F.2d at 661; *Newsom*, 888 F.2d at 374.

In sum, for all the reasons stated above, we find that appellant's Article 55 and Eighth Amendment claims are without merit. While we are cognizant that we may still award sentencing relief under Article 66, UCMJ, even if appellant's claims do not rise to the level of an Article 55/Eighth Amendment claim, *see United States v. Gay*, 75 M.J. 264, 268 (C.A.A.F. 2016), we decline to exercise our discretion to do so in this case.

## CONCLUSION

The finding of guilty to The Specification of Charge II is SET ASIDE and DISMISSED. The remaining findings of guilty are AFFIRMED.

Having considered the entire record, including the fact that the military judge imposed a segmented sentence of no confinement for The Specification of Charge II, after reassessing the sentence in accordance with the principles articulated by our superior court in *United States v. Sales*, 22 M.J. 305, 307-08 (C.M.A. 1986), *United States v. Winckelmann*, 73 M.J. 11, 15-16 (C.A.A.F. 2013), and most recently in *United States v. Smith*, __ MJ __, 2024 CAAF LEXIS 527, at *18 n.5 (C.A.A.F. 13 Sep. 2024), we AFFIRM the original sentence imposed by the military judge.

Judge PENLAND and Judge MORRIS concur.

FOR THE COURT:



JAMES W. HERRING, JR.
Clerk of Court

14